115 Cal.Rptr.2d 732 (2002)
95 Cal.App.4th 544
Rosemarie GAVALDON et al., Plaintiffs and Appellants,
v.
DAIMLERCHRYSLER CORPORATION, Defendant and Appellant.
Nos. G026626, G027036.
Court of Appeal, Fourth District, Division Three.
January 23, 2002.
Review Granted May 15, 2002.
*735 Horvitz & Levy, Lisa Perrochet, John A. Taylor, Jr., Encino, and Jon B. Eisenberg, Oakland; Even, Crandall, Wade, Lowe & Gates, Douglas D. Guy and Matthew M. Proudfoot, Irvine, for Defendant and Appellant.
Anderson & Anderson and Martin W. Anderson, Santa Ana, for Plaintiffs and Appellants.

OPINION
O'LEARY, J.
In this case, we hold a service contract, supplementing the factory warranty accompanying a new car, is not an express warranty entitling the consumer to the replacement or restitution remedy contained in section 1793.2, subdivision (d) of the Song-Beverly Consumer Warranty Act. (Civ.Code, § 1790 et seq., hereafter Song-Beverly.)[1]
DaimlerChrysler Corporation (hereafter Chrysler) appeals a judgment requiring it to repurchase Rosemarie and William Gavaldon's[2] Dodge Caravan minivan because of recurrent transmission problems occurring after the factory 3 year/36,000 mile warranty expired, but while a service contract was still in effect. It contends the trial court erred in concluding the service contract was also an express warranty. In *736 her cross-appeal, Gavaldon contends the trial court should have allowed her to elect coverage under an optional express warranty and improperly calculated damages. We reverse the judgment against Chrysler.
Gavaldon bought her new Dodge Caravan minivan in June 1993. The vehicle came with Chrysler's standard factory warranty under which the owner could choose either a 3-year/36,000 mile basic warranty (the 3/36 warranty) or a 12-month/12,000 mile basic warranty plus a 7-year/70,000 power train coverage. Gavaldon stipulated, and the trial court found, that the 3/36 warranty applied. The minivan also came with an anti-corrosion warranty and two 5-year/50,000 mile emission system warranties.
When Gavaldon purchased the minivan, she also purchased a service contract, issued by Chrysler, for an additional $890. The service contract provided it was to "protect [the buyer] against major repair bills should a component covered by the Plan fail in normal use." The stated coverage was: "The plan will pay the total cost (parts and labor) less a $25 deductible per visit, to correct any of the following part failures, due to a defect in materials or workmanship, not covered by the vehicle limited warranties." Covered components included power train parts such as the engine and transmission. The service contract advised the buyer the vehicle might also be covered by a manufacturer's limited warranty, only vehicles covered by one of Chrysler's regular limited warranties are eligible for the service contract, and it did not cover "[r]epair or replacement of any component covered by the vehicle's factory warranty or recall policies." It provided coverage for repairs would not start until the vehicle limited warranties expire, and ended "7 years after the factory warranty start date or when the vehicle has accumulated 70,000 total miles of service (whichever occurs first)." The service contract warned the buyer, "IMPORTANT! The maximum reimbursable amount should a covered component fail will be THE TOTAL COST OF THE REPAIRS LESS THE DEDUCIBLE OR, IF LESS, THE CASH VALUE OF THE VEHICLE!"
After she had driven the minivan about 22,000 miles, Gavaldon began to notice the transmission was "slipping." Although she took the vehicle to the dealer for regular service at 25,854 miles, 30,868 miles and 34,467 miles, she made no mention of any transmission problems.
At 39,361 miles, and again at 43,686 miles, Gavaldon took the minivan to the dealer for regular service and complained the transmission was shifting "hard" and getting stuck in gear. On both occasions, the dealer investigated but found no problems.
At 44,346 miles, the vehicle's transmission became stuck in limp-in mode and was towed to the dealership. In limp-in mode, the vehicle gets locked in second gear to protect the transmission from further damage while permitting the car to be driven at a reduced speed to a repair facility. The transmission was removed, overhauled, and the torque converter replaced. The repairs were covered by the service contract.
At 47,901 miles, Gavaldon took the minivan to the dealer complaining it was stalling at stops and surging as if running out of gas. The throttle position sensor, spark plug wires, and transmission controller were replaced. These repairs were covered by the emissions systems warranty.
At 48,644 miles, the vehicle was towed to the dealer because of overheating. The water pump, water pump gasket, and a heater hose were replaced and the repairs *737 were covered by the service contract. Although the dealer records made no mention of complaints about the transmission, Gavaldon testified the car was stuck in limp-in mode and she complained about the transmission.
At 50,989 miles, Gavaldon brought the car in complaining the transmission was slipping in and out of limp-in mode. The solenoid pack, which controls the transmission's hydraulic fluid, was replaced, as were a throttle positioning sensor and wiring harness.
In February 1997, Gavaldon wrote to the dealer, and then directly to Chrysler, complaining of the vehicle's chronic transmission problems and asking it be repurchased or replaced. Her request was denied.
At 54,922 miles, Gavaldon brought the car to the dealer complaining about the transmission's hard shifting and slipping. No problems were found.
In July 1997, at 56,962 miles, the minivan again got stuck in limp-in mode and was towed to the dealer. The transmission was completely replaced. The service contract paid the cost of the repairs. The new transmission was replaced again at 57,589 miles under a parts warranty because it was leaking.
Gavaldon did not present the minivan for any more repairs. In October 1997, she filed her complaint alleging Chrysler had breached its obligations under section 1793.2, subdivision (d) by failing to promptly replace or repurchase the minivan when it was unable to conform the vehicle to the applicable express warranties after a reasonable number of attempts. She also alleged Chrysler breached the express warranty under Song-Beverly (§ 1791.2, subd. (a)) and common law.[3] Gavaldon alleged the vehicle was covered by the 3/36,000 express warranty, a defect arose while that express warranty was still in effect, and Chrysler breached the express warranty by failing to remedy the defect. At trial, Gavaldon was permitted to amend her complaint to allege breach of the service contract as well.
A jury trial ended in a mistrial when the judge became ill. The second trial was a court trial. Before it began, the trial court ruled the service contract was not an express warranty under Song-Beverly.
On August 17, 1999, the court issued a tentative ruling in favor of Chrysler. It concluded the minivan's transmission was defective, but the defect arose after the applicable 3/36 express warranty had expired. It concluded the service contract was not an express warranty. Thus, Gavaldon's only remedy was for repairs to be made under the service contract, which had been performed. A judgment for Chrysler was entered on August 24.
On September 10, Gavaldon filed a notice of intention to move for a new trial. At a hearing on September 14, the court noted that its August 17 ruling was only a tentative ruling and it had now reached a different conclusion about the nature of the service contract. The court stated the August 24 judgment had been entered by mistake; the court had not intended a final judgment be entered because it had not yet finished deciding the case. Accordingly, it made a nunc pro tunc order vacating the August 24 judgment. On September 15, the court issued a new tentative ruling in favor of Gavaldon, and in response to *738 Chrysler's request, issued a formal statement of decision on October 6.
In its statement of decision, the court found Gavaldon had received the 3/36 express warranty with the minivan, which had expired before the transmission problems arose. The court concluded, however, that the service contract constituted an express warranty, entitling Gavaldon to the repurchase remedy set forth in section 1793.2, subdivision (d). Although the court believed its conclusion to be contrary to the Legislature's intent, it opined the holding in Reveles v. Toyota by the Bay (1997) 57 Cal.App.4th 1139, 67 Cal.Rptr.2d 543 compelled the result. The court held the only basis for Gavaldon to recover was by treating the service contract as an express warranty. It found the transmission defect was discovered at 44,388 miles when the transmission first became stuck in limp-in mode. Gavaldon was entitled to costs including attorney fees but not to civil penalties.
A judgment awarding Gavaldon $13,612.63 (purchase price minus a deduction for actual use of the vehicle) was entered on November 5, 1999. Chrysler appealed the November 5 judgment; Gavaldon cross-appealed. A post-judgment order awarded Gavaldon $75,000 in attorney fees and costs; Chrysler appealed that order as well and we ordered the two appeals consolidated.

I

Gavaldon's Motions to Dismiss Appeal
Before we address the merits of Chrysler's appeal, we must address several preliminary issues raised by Gavaldon. She has filed two separate motions to dismiss Chrysler's appeal and has made a third in her respondent's brief. None has merit; all are denied.

Failure to Appeal Order Vacating August 24 Judgment
Gavaldon contends the September 14, 1999, order vacating the judgment entered on August 24, 1999, was directly appealable. Chrysler appealed the final judgment entered November 5, 1999, but did not appeal the order vacating the earlier judgment. In her first motion to dismiss, Gavaldon argues the issue raised by Chrysler on this appealwhether the trial court erred in holding a service contract is an express warranty under section 1793.2, subdivision (d)could have been raised on appeal from the order vacating the first judgment. Therefore, we cannot consider it on an appeal from the final judgment. We reject the contention.
An order vacating a judgment is an appealable order (Code Civ. Proc., § 904.1, subd. (a)(1) & (2); Baldwin v. Home Sav. of America (1997) 59 Cal. App.4th 1192, 1195, 69 Cal.Rptr.2d 592), if the underlying judgment was an appealable final judgment (Elsea v. Saberi (1992) 4 Cal.App.4th 625, 628, 5 Cal.Rptr.2d 742). The September 14 order vacating the August 24 judgment was not appealable because the judgment was not final. When the court vacated the August 24 judgment nunc pro tunc, it stated that judgment had been entered by mistake and it had never intended to enter a final judgment because it was not finished deciding the case. The trial court has inherent authority to correct its clerical errors with nunc pro tunc orders. (Hamilton v. Laine (1997) 57 Cal. App.4th 885, 890, 67 Cal.Rptr.2d 407.) We take the court at its word the August 24 judgment was entered by mistake. It was entered just a few days after its tentative ruling was issued. The court had not yet issued a statement of decisionindeed the time for requesting one had not even expired. (Code Civ. Proc., § 632.) We deny the motion to dismiss.

*739 Collateral Estoppel

Gavaldon argues the doctrine of collateral estoppel bars Chrysler's appeal. Again, we reject her contention.
On October 12, 2000, after this appeal was filed, a judgment was entered in Los Angeles County against Chrysler in a virtually identical case involving a different plaintiff. (Hernandez v. Chrysler Corporation (Super.Ct.L.A.County, 2000, No. VC029470).) In that case, after the trial court instructed the jury that a service contract is an express warranty under Song-Beverly, the jury returned a verdict finding Chrysler had violated its duty to replace or repurchase a defective vehicle under section 1793.2, subdivision (d). Gavaldon claims Chrysler filed its notice of appeal of that judgment one day too late, and we should deem it to be a final judgment. From that premise, she goes on to assert Chrysler is now forever barred from contending in any court that a service contract is not an express warranty.
We need not address the merits of Gavaldon's motion.[4] We reject her argument for the simple reason that there is not a final judgment in the Los Angeles County case. In fact, there no longer is any judgment. The parties settled the action and stipulated the judgment would be vacated and the action dismissed with prejudice. On February 21, 2001, the Los Angeles County Superior Court vacated the judgment and dismissed the action. Accordingly, we deny Gavaldon's second motion to dismiss.

Incomplete Appellant's Appendix
Finally, in her opening brief, Gavaldon argues we must dismiss Chrysler's appeal because it filed an incomplete appellant's appendix. (Cal. Rules of Court, rule 5.1) Specifically, she complains that Chrysler omitted three trial exhibits from the appellant's appendix. She also objects because one of the exhibits which was included, the service contract, was not the actual one admitted at trial. Chrysler's appendix included the form service contract, while the one admitted at trial had Gavaldon's name and information about her vehicle on it. Gavaldon did not include any of these items in a respondent's appendix. The filled-out version of the service contract was included in Chrysler's reply appendix; the other omitted exhibits were not.
We reject Gavaldon's assertion these transgressions mandate dismissal of the appeal. Under the version of California Rules of Court, rule 5.1, in effect when this appeal was filed and briefed, sanctions could be imposed for the "[w]illful or grossly negligent filing of an appendix containing nonconforming copies," or for filing an appendix that "is so inadequate that justice cannot be done," (former Cal. Rules of Court, rule 5.1(i )(1) & (2), italics added),[5] but neither appears to be the case *740 here. Gavaldon does not suggest she was prejudiced by the omissions or that they affect our ability to review this matter. Furthermore, "[a]ll exhibits admitted in evidence or refused are deemed part of the appendix, whether or not it contains copies of them." (Cal. Rules of Court, rule 5.1(b)(5).) Gavaldon does not suggest the omitted exhibits were relevant to any issues presented. She does not contend the blank form service contract is in any way different than the one that had her name typed on it. Furthermore, if there were omitted items Gavaldon believed to be relevant, she could have included them in a respondent's appendix but did not. (Cal. Rules of Court, rule 5.1(b)(6).) In any event, the filled-in service contract is contained in the appellant's reply appendix.

II

Statement of Decision: Doctrine of Implied Findings
Gavaldon argues that despite the trial court's issuance of a formal statement of decision (Code Civ. Proc., § 632) setting forth the factual and legal basis for its ruling in her favor, we must apply the doctrine of implied findings and affirm the judgment if correct on any theory supported by the evidence. We reject her contention.
If timely requested, the trial court in a nonjury trial must issue a statement of decision explaining the factual and legal basis for its decision on each of the principal controverted issues for which the statement was requested. (Code Civ. Proc., § 632.) The statement of decision provides a record of the court's reasoning on particular disputed issues which we may review in determining whether its decision is supported by the evidence and the law. (Eisenberg et al., Cal. Practice Guide: Civil Appeals & Writs (The Rutter Group 2000) ¶ 8:21, p. 8-7; In Re Marriage of Ditto (1988) 206 Cal.App.3d 643, 649, 253 Cal.Rptr. 770.) If the parties have waived a statement of decision by failing to request it or requesting it too late, then we presume the court made all factual findings necessary to support the judgment for which substantial evidence exists in the record. (Michael U. v. Jamie B. (1985) 39 Cal.3d 787, 792-793, 218 Cal. Rptr. 39, 705 P.2d 362.)
Gavaldon argues we must adopt the doctrine of implied findings, even though a statement of decision was requested and issued, because the formal statement of decision was not included in Chrysler's appellant's appendix. Chrysler remedied the defect by including it in the reply appendix. Gavaldon cites In Re Marriage of Ditto, supra, 206 Cal.App.3d at page 649, 253 Cal.Rptr. 770 as holding that when a statement of decision is not included in the appellant's appendix, "all intendments will favor the trial court's ruling and it will be presumed on appeal that the trial court found all facts necessary to support the judgment." But she misquotes and misrepresents the case. In Ditto, no statement of decision was issued by the trial court because none was requested. Ditto held that when "no statement of decision was requested," the doctrine of implied findings applies. (Ibid.) Given that Gavaldon has cited no authority supporting her proposition, that a statement of decision was requested and issued, and that it is contained in the reply appendix, we find no basis for disregarding it as she urges.

III

Liability Under Song-Beverly
In its statement of decision, the trial court found Gavaldon had received a 3 *741 year/36,000 mile express warranty with the minivan, which had expired before the transmission problems arose. It concluded the only basis for recovery was if the service contract constituted an express warranty under section 1793.2, subdivision (d). The trial court held it did and concluded Chrysler had breached its obligations under that section by failing to promptly replace or repurchase the minivan when it was unable to conform the vehicle to an express warranty after a reasonable number of attempts. We agree with Chrysler that this ruling was legally incorrect.

Background
Song-Beverly, enacted in 1970, outlines protective measures for buyers of consumer goods. (Stats.1970, ch. 1333, p. 2478 et seq.) It "regulates warranty terms, imposes service and repair obligations on manufacturers, distributors, and retailers who make express warranties, requires disclosure of specified information in express warranties, and broadens a buyer's remedies to include costs, attorney's fees, and civil penalties. [Citations.]" (Krieger v. Nick Alexander Imports, Inc. (1991) 234 Cal.App.3d 205, 213, 285 Cal.Rptr. 717.) Song-Beverly "is manifestly a remedial measure, intended for the protection of the consumer; it should be given a construction calculated to bring its benefits into action. [Citation.]" (Kwan v. Mercedes-Benz of North America, Inc. (1994) 23 Cal.App.4th 174, 184, 28 Cal.Rptr.2d 371.)
Section 1794, subdivision (a) provides, "Any buyer of consumer goods who is damaged by a failure to comply with any obligation under this chapter or under an implied or express warranty or service contract may bring an action for the recovery of damages and other legal and equitable relief." Subdivision (b) provides the measure of damage "shall include the rights of replacement or reimbursement as set forth in subdivision (d) of Section 1793.2, and the following: [¶] (1) Where the buyer has rightfully rejected or justifiably revoked acceptance of the goods or has exercised any right to cancel the sale, Sections 2711, 2712, and 2713 of the Commercial Code shall apply. [¶] (2) Where the buyer has accepted the goods, Sections 2714 and 2715 of the Commercial Code shall apply, and the measure of damages shall include the cost of repairs necessary to make the goods conform."
A core provision of Song-Beverly, as it pertains to new motor vehicles, is the remedy of replacement or restitution contained in section 1793.2, subdivision (d)(2). It provides, "If the manufacturer or its representative in this state is unable to service or repair a new motor vehicle, as that term is defined in paragraph (2) of subdivision (e) of Section 1793.22, to conform to the applicable express warranties after a reasonable number of attempts, the manufacturer shall either promptly replace the new motor vehicle in accordance with subparagraph (A) or promptly make restitution to the buyer in accordance with subparagraph (B). However, the buyer shall be free to elect restitution in lieu of replacement, and in no event shall the buyer be required by the manufacturer to accept a replacement vehicle." (Italics added.)
Section 1791.2 defines an "express warranty" as "[a] written statement arising out of a sale to the consumer of a consumer good pursuant to which the manufacturer, distributor, or retailer undertakes to preserve or maintain the utility or performance of the consumer good or provide compensation if there is a failure in utility or performance." (§ 1791.2, subd. (a)(1).) "It is not necessary to the creation of an express warranty that formal words such as `warrant' or `guarantee' be used, but if *742 such words are used then an express warranty is created." (§ 1791.2, subd. (b).)
It is undisputed that the replacement and restitution remedy of section 1793.2, subdivision (d)(2) applies only when there has been a failure to conform to an express warranty. The issue is whether "express warranty," as that term is used in section 1793.2, subdivision (d)(2), includes a service contract. We conclude it does not.

Other Express Warranties
Preliminarily, Gavaldon argues we may affirm the judgment based on express warranties other than the service contract. She argues the 5 year/50,000 mile emissions systems warranty was still in effect when the transmission problems arose and we should affirm based on finding Chrysler failed to conform the vehicle to that warranty. She also argues we may affirm under the 3/36 warranty because the evidence supports a finding that the transmission problems arose while the warranty was still in effect, even though she did not report them until after it had expired. We cannot affirm on either of these theories as they are contrary to the express findings the trial court made in its statement of decision. The trial court found Gavaldon had received a 3/36 warranty, the problems did not arise until after the 3/36 warranty had expired and the only applicable "warranty" was the service contract. Gavaldon filed no objections to the statement of decision and does not appeal these findings.[6]

Service Contract not an Express Warranty
We agree with Chrysler that its service contract is not an express warranty under section 1793.2, subdivision (d)(2). Song-Beverly separately regulates service contracts, and nowhere in the act is the term used synonymously with "express warranty." A "service contract" is defined as "a contract in writing to perform, for an additional cost, over a fixed period of time or for a specified duration, services relating to the maintenance, replacement, or repair of a consumer product, except that this term does not include a policy of automobile insurance, as defined in Section 116 of the Insurance Code." (§ 1791, subd. (o).) The act envisions that a service contract made be sold "in addition to, or in lieu of, an express warranty," provided that it "fully and conspicuously discloses in simple and readily understood language the terms, conditions, and exclusions of that contract ...." (§ 1794.4, subd. (a).) A service contract must obligate the service contract seller to provide the buyer "all of the services and functional parts that may be necessary to maintain proper operation of the entire product ... for the duration of the service contract and without additional charge." (§ 1794.4, subd. (b).) But a service contract may not duplicate the coverage of the product's express warranty. Section 1794.41, subdivision (a)(3) provides, "The [service] contract is applicable only to items, costs, and time periods not covered by the express warranty." (Italics added.) The service contract "may run concurrently with or overlap an express warranty" only if it "covers items or costs not covered by the express warranty or .. . provides relief to the purchaser not available under the express warranty, such as automatic replacement of a product where the express warranty only provides for repair."
Throughout Song-Beverly, express warranties are distinguished from service contracts. We see nothing in the plain language *743 of the statutory scheme indicating the Legislature intended to extend section 1793.2, subdivision (d)(2)'s replacement or restitution remedy to service contracts. Furthermore, nothing in the service contract purchased by Gavaldon should have led her to believe the remedy would apply. The service contract plainly warned, "IMPORTANT! The maximum reimbursable amount should a covered component fail will be THE TOTAL COST OF THE REPAIRS LESS THE DEDUCTIBLE OR, IF LESS, THE CASH VALUE OF THE VEHICLE!"
The trial court initially determined a service contract was not an express warranty. But it subsequently changed its position, even though it believed it to be contrary to the Legislative intent, concluding the reasoning in Reveles v. Toyota by the Bay, supra, 57 Cal.App.4th 1139, 67 Cal.Rptr.2d 543 compelled its result. We conclude Reveles is not controlling.
In Reveles, the plaintiff purchased a used vehicle from a dealership. The sale was "as is," i.e., without an express warranty, so he also purchased a "vehicle service agreement" covering "repair of mechanical failures" of various parts for two years or 24,000 miles. Two months later, the front end of the car suddenly dropped, and the dealer's mechanic told the plaintiff the vehicle had significant preexisting frame damage and could not be repaired. Nonetheless, the dealer refused the plaintiffs demand it replace the vehicle or refund his purchase price, insisting repairs would be made. (Reveles v. Toyota by the Bay, supra, 57 Cal.App.4th at p. 1145, 67 Cal.Rptr.2d 543.)
The plaintiff sued the dealer for breach of contract, rescission and restitution, negligent and intentional misrepresentation, breach of the Consumers Legal Remedies Act (§ 1750 et seq.) and breach of Song-Beverly. After rejecting the plaintiffs repeated offers to settle for $9,300, on the morning of trial the dealer announced it would settle for that amount. The plaintiff settled but reserved his right to move for attorney fees and costs to which he argued he was entitled under Code of Civil Procedure section 1032, section 1717, the Consumers Legal Remedies Act and Song-Beverly. The trial court eventually found the plaintiff was the prevailing party and awarded him $19,000 in attorney fees, $1,953 in expert witness fees, and $1,239 in other costs. (Reveles v. Toyota by the Bay, supra, 57 Cal.App.4th at pp. 1146-1148, 67 Cal.Rptr.2d 543.)
The appellate department of the superior court reversed the award, but the appellate court affirmed it. (Reveles v. Toyota by the Bay, supra, 57 Cal.App.4th at pp. 1149, 1158, 67 Cal.Rptr.2d 543.) After confirming attorney fees and costs were properly awarded under section 1717 and Code of Civil Procedure section 1032, the court went on to hold attorney fees were also properly awarded under the Consumers Legal Remedies Act, and under Song-Beverly, attorney fees and expert witness fees were recoverable. (Reveles v. Toyota by the Bay, supra, 57 Cal.App.4th at pp. 1154,1158, 67 Cal.Rptr.2d 543.)
The issue in Reveles with respect to Song-Beverly, was whether the plaintiff as a purchaser of a used car was in any way protected by the act so as to affirm his recovery of costs and attorney fees. Song-Beverly applies to the purchase of "consumer goods" which are generally defined as being "new" goods. (§ 1791, subd. (a).) Notwithstanding that definition, section 1795.5 provides Song-Beverly also applies to "used consumer goods in a sale in which an express warranty is given." (Italics added.) The plaintiffs used car was sold "as is," but he had purchased a service contract. The court was confronted with whether that service contract was *744 an express warranty so that the used car transaction would be brought under Song-Beverly's protection via section 1795.5.
The Reveles court reviewed the legislative history of Song-Beverly with respect to its regulation of service contracts. (Reveles v. Toyota by the Bay, supra, 57 Cal.App.4th at pp. 1154-1158, 67 Cal. Rptr.2d 543.) The original act made little mention of service contracts. But through subsequent amendments, the Legislature substantially broadened its regulation of service contracts. Furthermore, those statutes regulating service contracts applied "whether ancillary to new or used product sales." (Id. at p. 1156, 67 Cal. Rptr.2d 543, italics added; see § 1794.4, subd. (d) [applies to "service contracts on all new or used products"].)
The Reveles court concluded that unless "express warranty," as used in section 1795.5, was interpreted to include service contracts, the plaintiff would have no remedy for the dealer's breach of sections 1794.4, subdivisions (b) (service contract seller must provide buyer all services and functional parts necessary to maintain proper operation of entire product) and (d) (section 1794.4, subd. (b) applies to service contract on new or used product) and those provisions would be rendered meaningless. (Reveles v. Toyota by the Bay, supra, 57 Cal.App.4th at pp. 1157-1158, 67 Cal.Rptr.2d 543.) Given the Legislature's intent "to eliminate misleading `sales gimmicks,' and to ameliorate consumer frustration caused by inability to obtain promised repair services" the court concluded the statute should be construed to extend protection to the consumer. (Id. at p. 1158, 67 Cal.Rptr.2d 543.) Accordingly, it found "a written service contract covering a used vehicle, under which the dealer 'undertakes to preserve or maintain the utility or performance' of the vehicle, is an 'express warranty' under section 1795.5...." (Ibid.)
But Reveles does not compel a similar holding in this case. Preliminarily, Reveles was not confronted with the same issue. (See People v. Gilbert (1969) 1 Cal.3d 475, 482, fn. 7, 82 Cal.Rptr. 724, 462 P.2d 580 ["cases are not authority for propositions not considered"].) Here, we are considering whether section 1793.2, subdivision (d)(2)'s replacement or restitution remedy applies when the manufacturer's factory warranty has expired, but a service contract is still in effect. Reveles considered whether there was any remedy available at all under Song-Beverly for the purchaser of a service contract ancillary to used goods, so as to permit an award of attorney fees.
We agree Reveles confronted an apparent anomaly in the statutory scheme with respect to the purchaser of used goods. Section 1794, sets out the remedies available to the purchaser of "consumer goods" in the event of the breach of a service contract-damages and other equitable relief. "Consumer goods" are defined by the act as new goods. Thus, even though section 1794.4, regulating service contracts, applies to service contracts sold ancillary to used goods, there would be no Song-Beverly remedy for breach of a service contract unless section 1795.5 applied. Reveles interpreted the statute in favor of extending protection to the purchaser of used goods.
We need not extend the reasoning in Reveles. There is no question that Song-Beverly protections are afforded to the service contract Gavaldon purchased with her new vehicle. But throughout the act, the Legislature has clearly distinguished between express warranties and service contracts. Section 1794 specifies the available remedies in the event of a breach of a service contract. We cannot say the Legislature *745 had an unexpressed intention to extend the replacement or restitution remedy of section 1793.2, subdivision (d)(2) to service contracts as well.

Independent Breach of the Service Contract
Gavaldon urges that if we conclude, as we do, that a service contract is not an express warranty which invokes the replacement or restitution remedy of section 1793.2, subdivision (d)(2), we may nonetheless affirm the damage award based on Chrysler's breach of the service contract. She argues the service contract was breached because Chrysler failed to repair the vehicle.
First, the contention appears to directly contradict a trial court finding that the service contract had not been breached. In its original statement of decision, the court found Gavaldon's only remedy was for repairs to be made under the service contract, and since the service contract was not an express warranty, she had no remedy under section 1793.2, subdivision (d)(2). Because it ruled in favor of Chrysler, it implicitly found Chrysler had performed the repairs required under the service contract, i.e., it had not breached the service contract. The court subsequently concluded the service contract was an express warranty under section 1793.2, subd., (d)(2), and Gavaldon had a remedy under that section alone. Gavaldon did not challenge the finding there was no breach of the service contract in her cross appeal.
Even if we implied into the judgment a finding Chrysler had breached the service contract, Gavaldon presented no evidence of her damages for such a breach. Under section 1794, a buyer who has been damaged by a failure to comply with the obligations under a service contract is entitled to damages or other equitable relief. The measure of damages would generally be either the cost of repairs or diminution in value as a result of the unrepaired defect. (§ 1794, subd. (b)(2).) At trial, Gavaldon's counsel conceded that if the replacement or restitution remedy of section 1793.2, subdivision (d)(2) did not apply, this was the appropriate measure of damages. But Gavaldon presented no evidence of additional repairs that needed to be made to the vehicle, or that Chrysler at any time denied coverage for necessary repairs. Indeed, on the occasions that the dealer identified problems with the minivan's transmission, Chrysler paid for the repairs, including fully replacing the transmission twicethe second time because the first new transmission leaked. Gavaldon testified even with the new transmission, the vehicle continued to have problems and she did not want to drive it. But there was no evidence of repairs Chrysler should have made, but did not make, or of any repairs that were still necessary. Furthermore, as her counsel conceded, there was no evidence admitted as to the diminution in value of the minivan as a result of the transmission problems save for Gavaldon's testimony that she considered it to be worthless.[7]
*746 The trial court's judgment was based solely on its legal conclusion that a service contract is an express warranty entitling the buyer of a vehicle to obtain restitution of the purchase price under section 1793.2, subdivision (d)(2). That determination was incorrect and there is no other basis for affirming the judgment.

IV

Gavaldon's Cross-Appeal
Because we reverse the judgment, we need not consider the issue raised in Gavaldon's cross-appeal that the calculation of damages was incorrect. Nor need we address her contention that the trial court erred in requiring her to return the vehicle to Chrysler as a condition of receiving restitution of the purchase price. (Gavaldon argues she is entitled to a refund of the purchase price and to keep the vehicle as well.) We do, however, briefly address, and reject, her contention that at trial she should have been allowed to select the optional 12-month/12,000 mile basic warranty plus a 7-year/70,000 power train coverage.
When Gavaldon purchased her minivan, she was provided with a warranty booklet. It explained that her vehicle came with Chrysler's standard factory warranty under which the owner could choose either the 3/36 basic warranty or a 12-month/12, 000 mile basic warranty plus a 7-year/70, 000 power train coverage. The warranty booklet explained the owner was to elect the coverage he or she wanted by filling in a form at the back of the booklet. The owner had 30 days in which to change his or her mind about which coverage to take. There was no default provision designating one of the warranty plans if no particular coverage was selected.
Gavaldon never filled in her warranty booklet, but her complaint alleged the minivan was covered by the 3/36 warranty. During discovery, she admitted the 3/36 warranty applied. Before the first trial, she stipulated the 3/36 warranty applied, and the first trial proceeded on the assumption the 3/36 warranty applied. Apparently, Gavaldon never read her warranty booklet, and just before the second trial began she realized she could have selected the longer warranty. During her testimony, she attempted to testify she was now "electing" coverage under the 12-month/ 12,000 mile basic warranty plus a 7-year/ 70,000 power train warranty. The trial court refused to permit her to make the "election" and found the 3/36 warranty applied.
Gavaldon contends the trial court erred by not permitting her to testify she was now electing coverage under the longer express warranty. She cites absolutely no legal authority in support of her claim, and for this reason we reject it. (Kim v. Sumitomo Bank (1993) 17 Cal.App.4th 974, 979, 21 Cal.Rptr.2d 834 [court not required to discuss or consider points not supported by citation to authorities or record].)

DISPOSITION
The judgment is reversed. The postjudgment order awarding attorney fees and costs is reversed. Chrysler is awarded its costs on appeal.
WE CONCUR: SILLS, P.J., and MOORE, J.
NOTES
[1] All further statutory references are to the Civil Code unless otherwise indicated.
[2] Although Rosemarie and William Gavaldon are both owners of the vehicle and plaintiffs in this action, it appears the minivan was primarily driven by Rosemarie Gavaldon, she had the primary contacts with the dealer, and she alone testified at trial. Therefore, for convenience, we will refer to the Gavaldons in the singular.
[3] Causes of action for breach of an express warranty created by a sample of model (§ 1791.2, subd. (b)) and breach of an implied warranty of merchantability were disposed of and are not part of this appeal.
[4] "In general, collateral estoppel precludes a party from relitigating issues litigated and decided in a prior proceeding. [Citations.]" (Gikas v. Zolin (1993) 6 Cal.4th 841, 848-849, 25 Cal.Rptr.2d 500, 863 P.2d 745, italics added.) "An important qualification of the doctrine . . . [is] `[w]here a question of law essential to the judgment is actually litigated and determined by a valid and final personal judgment, the determination is not conclusive between the parties in a subsequent action on a different cause of action, except where both causes of action arose out of the same subject matter or transaction; and in any event it is not conclusive if injustice would result.'" (Louis Stores, Inc. v. Department of Alcoholic Beverage Control (1962) 57 Cal.2d 749, 757, 22 Cal.Rptr. 14, 371 P.2d 758, italics omitted.)
[5] Effective January 1, 2002, California Rules of Court, rule 5.1 was amended to omit subdivision (i). The new subdivision (f) now reads, "Filing an appendix constitutes a representation that the appendix consists of accurate copies of documents in the superior court file. The reviewing court may impose monetary or other sanctions for filing an appendix that contains inaccurate copies or otherwise violates this rule."
[6] In part IV of our opinion, we separately address Gavaldon's argument regarding the optional 12-month/12,000 mile basic warranty plus a 7-year/70,000 power train coverage.
[7] Gavaldon argues restitution of her original purchase price was appropriate for breach of the service contract under California Uniform Commercial Code section 2711 if she "rightfully rejected or justifiably revoked acceptance of the goods or has exercised any right to cancel the sale." (§ 1794, subd. (b)(1).) But this theory was never presented at trial and involves a factual determination as to whether one can justifiably revoke acceptance of a vehicle after three years, more than 50,000 miles of driving, and after the express warranty has expired. We seriously doubt it. (See Cooper v. Mason (1972) 14 N.C.App. 472, 188 S.E.2d 653, 655 [under Uniform Commercial Code section 2608, requiring revocation be within reasonable time, "It would seem that seventeen months and 30,000 miles exceed a reasonable time for revocation of the purchase of the automobile under the most liberal interpretations of the term."])